***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission adopts the Opinion and Award of Deputy Commissioner Donovan with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. All defendants are properly before the Commission, and the Commission has jurisdiction over the subject matter.
2. At all times relevant to I.C. File 468289, defendant-employer Cooper Standard was self-insured and Gallagher-Bassett was the third party administrator. At all times relevant to I.C. File 865170, defendant-employer Cooper Standard was self-insured and St. Paul/ Travelers were the third party administrator.
3. Plaintiff's average weekly wage was $724.29 per week at the time of her compensable occupational disease in I.C. File No. 468269, yielding a workers' compensation rate of $482.88. No stipulation was reached regarding the average weekly wage in I.C. File No. 865170.
 *********** ORDER
Plaintiff's claim in I.C. No. 468289 is brought on grounds of a change in condition that entitles plaintiff to compensation under the Workers' Compensation Act. Plaintiff's claim in I.C. No. 865170, is brought on grounds that plaintiff's current work conditions had aggravated a pre-existing condition sufficient to support a new claim. In plaintiff's Contentions, she expressly states that the evidence does not support the claim that is the basis of I.C. No. 865170 and that she wishes to proceed only on the claim that is the basis of I.C. No. 468289. Accordingly, it is hereby ORDERED that the claim against defendant-carrier St. Paul Travelers in I.C. No. 865170 is severed from I.C. No. 468289 and is DISMISSED. Therefore, this Opinion and Award only addresses the issues raised in I.C. No. 468289.
 *********** EXHIBITS *Page 3 
The parties stipulated to the following documentary evidence:
 • Medical records, I.C. Forms, personnel records, discovery, job logs, and correspondence.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 49 years old. She received a GED in 1976 and earned an associate degree in criminal justice in 1992. In 1995, plaintiff began working for defendant-employer, a manufacturer of window seals for automobiles. While working for defendant-employer, plaintiff performed a variety of positions, including trimmer, machine operator, and mold operator. All of the jobs with defendant-employer were production jobs manufacturing different parts.
2. In 2000, plaintiff began having problems with her right hand. At that time, plaintiff was operating the mold machine and developed pain in her right hand. She was diagnosed with tendonitis of the wrist and was given work restrictions.
3. In February 2003, plaintiff again developed problems with her right hand. She presented for treatment at Goldsboro Orthopaedic Associates and was diagnosed with de Quervain's tenosynovitis. Defendant-carrier began paying medical compensation for plaintiff's condition. Plaintiff was taken off the mold job and assigned to an alternate position. On 21 April 2003, Dr. Hector Pedraza with Goldsboro Orthopaedic Associates noted that plaintiff's symptoms were dramatically better and released plaintiff to full activities. *Page 4 
4. In May 2004, plaintiff had a recurrence of her right hand problems. At that time plaintiff was using her hand to trim in her employment with defendant-carrier. Dr. Pedraza advised plaintiff not to return to her previous assigned job and that she should be placed in another job that did not require forceful thumb activity.
5. On 9 December 2004, plaintiff presented to Dr. Kimberly Barrie with Triangle Orthopaedic Associates who assessed plaintiff with right wrist de Quervain's tendonitis, injected plaintiff's wrist with a steroid solution, and released plaintiff with restrictions of no lifting greater than five pounds and full time use of the right wrist splint while at work.
6. Plaintiff returned for follow-up with Dr. Barrie on 30 December 2004. Dr. Barrie recommended that plaintiff be weaned out of her forearm based thumb spica splint and advised that she could continue to work so long as she maintained a five pound lifting restriction. When plaintiff returned to Triangle Orthopaedic Associates on 24 January 2005, Dr. Barrie noted that plaintiff was doing much better since her last visit, and that she had been weaned from her splint with no problem. Dr. Barrie deemed plaintiff to have reached maximum medical improvement on 24 January 2005, assigned a permanent partial impairment rating of five percent to plaintiff's right hand, and released her to return to work full duty with permanent restrictions of lifting as tolerated and no mold and trim work.
7. On 5 June 2005, the Industrial Commission approved a Form 21 agreement entered into by the parties in which plaintiff accepted payment of the five percent permanent partial disability rating. A Form 28B dated 17 June 2005 indicated the last compensation check was forwarded on 14 June 2005.
8. After her release by Dr. Barrie, plaintiff continued to work for defendant-employer. By 2006 plaintiff was performing a job called "final inspection" or "cutting down *Page 5 
parts," in which she inspected parts and used her right hand to trim approximately 100 rubber strips per day. Plaintiff had intermittent hand symptoms doing those jobs.
9. On 31 August 2006, plaintiff returned for follow-up with Dr. Barrie, for an update of her restrictions. Plaintiff complained of intermittent right wrist pain, which was controlled so long as she avoided doing mold and trim work. Dr. Barrie characterized her examination of plaintiff as being perfectly normal. Dr. Barrie explained to plaintiff that she would recommend permanent restrictions of no mold and trim work, although plaintiff did not appear to be symptomatic at that time. Dr. Barrie explained that the work restriction of no lifting greater than five pounds included in the 31 August 2006 record was a typographical error and that it was not her intent to include that restriction. Dr. Barrie scheduled plaintiff to return on an as needed basis.
10. On 6 October 2006, plaintiff was laid off from her job because she was under medical restrictions. Under the terms of defendant-employer's long-term layoff policy, plaintiff was allowed to retain recall privileges, meaning that if any positions became available during the six months between October of 2006 and April of 2007, she could be called back to work. Plaintiff was not called back to work during that six-month period and received notice of termination by letter dated 11 April 2007.
11. On 9 April 2007, plaintiff filed a Form 33 claim for additional medical treatment, less than two years after the final payment of benefits under the 17 June 2005 Form 28B.
12. After being laid off by defendant-employer, plaintiff began seeking other employment and maintained job search logs. Plaintiff's testimony combined with her job search logs establishes that she regularly looked for work from the date of her layoff through the time of the hearing before the deputy commissioner, with the exception of a short period for *Page 6 
approximately two months during April and May 2007 when plaintiff first enrolled in the Federal Trade Readjustment Assistance Program under the Federal Trade Act.
13. Plaintiff regularly contacted employers to try to find work at the rate of three contacts per week, every week. Plaintiff's search included searching the newspaper every day, sending in applications, searching for computer job listings with help from the ESC staff, looking at the library, making cold calls and visits to employers, and getting leads from family and friends. Plaintiff has inquired about a wide variety of jobs that include retail sales, child care, hotel, grocery store, office, travel agency, copy shop, medical, government agency, restaurant, cafeteria, rental store, and manufacturing plant work.
14. Despite regularly looking for work, plaintiff was unable to find employment through the date of the hearing before the deputy commissioner. Plaintiff has not been offered or turned down any suitable employment. Defendant-employer did not offer plaintiff any work after 6 October 2006, and did not have work available that she could perform.
15. On 21 January 2008, plaintiff returned for follow-up with Dr. Barrie. Plaintiff gave a history of having lost her job with defendant-employer within the one-and-a-half years since her last appointment. Plaintiff complained of pain on the radial side of the right wrist, and expressed concern over her ability to return to regular work without restrictions. Dr. Barrie assessed recurrent right de Quervain's tendonitis and administered a steroid injection. Dr. Barrie opined that if defendant-employer had been compliant with the restrictions of no mold and no trim work during the last 18 months of her employment, then she would say that her work did not further aggravate plaintiff's condition after she last saw plaintiff because she did not see plaintiff again until 21 January 2008. *Page 7 
16. On 11 February 2008, plaintiff returned for follow-up with Dr. Barrie, who noted that the steroid injection administered on 21 January 2008 had completely eliminated plaintiff's pain. Dr. Barrie recommended work hardening for three weeks on a daily basis and released plaintiff with temporary restrictions of no lifting greater than ten pounds for three weeks pending her next evaluation to quiet down the inflammation. Dr. Barrie has not treated plaintiff since that date.
17. In May 2008, defendant-employer had a one-time vocational evaluation and labor market survey performed to determine whether plaintiff was employable in Wayne County. The specialist did not actually help plaintiff job hunt, and there were no vocational rehabilitation services provided. The evaluation revealed that plaintiff's relative skills were consumer economics, art skills, clerical skills, science skills, service skills, and outdoor technology. The labor market survey which examined jobs listed on plaintiff's job search logs that she had already unsuccessfully contacted for employment identified the following potential employers who were hiring and had available positions: full-time deli/bakery associate for Food Lion (wage not disclosed); part-time front end sales associate for Food Lion ($7.00 per hour to start); sales associate for Maurice's, Inc. ($6.50 per hour to start); retail wireless consultant for U.S. Cellular (hourly paid plus commission but exact details not disclosed); sales associate for Goody's ($6.15 per hour to start, varies upon experience); book seller for Books-A-Million (wage not disclosed); sales person at Furniture Fair ($6.15 per hour to start but varies depending on experience); sales associate for Lane Bryant ($6.50 to start); front desk clerk for Holiday Inn Express ($6.50 per hour); hourly sales support associate for J.C. Penney (wage not disclosed); hostess at Texas Steakhouse Saloon (wage not disclosed). Plaintiff's choice of what jobs to apply for was reasonable. Plaintiff has skills that are transferable to the jobs for which she has *Page 8 
applied, and there are jobs that exist in the local economy which plaintiff, if she could get them, should be able to perform. For the actual jobs researched, plaintiff's anticipated earning capacity would entail a wage loss of approximately $6 per hour, or almost fifty percent of her pre-injury wages.
18. Plaintiff would benefit from the provision of vocational rehabilitation services in order to assist her return to work at a pay rate approximating her pre-injury wage. She could also benefit from job placement assistance, assistance with her resume, coaching, other types of education to help improve her chances of finding a higher paying job, and other similar vocational services.
19. Plaintiff's average weekly wage was $724.29 per week at the time of her compensable occupational disease, yielding a workers' compensation rate of $482.88 per week.
20. Defendants have not defended this claim unreasonably.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. "The party seeking to modify an award based on a change of condition bears the burden of proving that a new condition exists and that it is causally related to the injury upon which the award is based." Shingletonv. Kobacker Group, 148 N.C. App. 667, 670, 559 S.E.2d 277, 280
(2002). "Our case law defines a `change in condition' under N.C. Gen. Stat. § 97-47 as a condition occurring after a final award of compensation that is `different from those existent when the award was made [,]' . . . and results in a substantial change in the physical capacity to earn wages." Pomeroy v. Tanner Masonry, 151 N.C. App. 171,179, 565 S.E.2d 209, 215 (2002). *Page 9 
2. "This `change in condition' can consist of either [1] a change in the claimant's physical condition that impacts his earning capacity, [2] a change in the claimant's earning capacity even though claimant's physical condition remains unchanged, or [3] a change in the degree of disability even though claimant's physical condition remains unchanged."Id. Thus, as a prerequisite to establishing a substantial change in condition within the meaning of N.C. Gen. Stat. § 97-47, plaintiff must prove a decrease in earning capacity. Id. In this context, a decrease in earning capacity is shown by the production of:
 (1) medical evidence that plaintiff is physically or mentally, as a consequence of the work related injury, incapable of work in any employment,
 (2) evidence that plaintiff is capable of some work, but that has, after a reasonable effort on her part, been unsuccessful in his effort to obtain employment,
 (3) evidence that plaintiff is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment, or
 (4) evidence that he has obtained other employment at a wage less than that earned prior to the injury.
Shingleton, 148 N.C. App. at 671, 559 S.E.2d at 280 (2002).
3. Plaintiff has shown a change of condition by proving a change in her earning capacity even though her physical condition remains unchanged in that her layoff from employment with defendant-employer was solely based upon the permanent restrictions assigned to her because of her accepted compensable work-related condition. Accordingly, the *Page 10 
undersigned conclude as a matter of law that a substantial change in plaintiff's physical capacity to earn wages has occurred and is directly related to her original compensable injury. Id.
4. Plaintiff is entitled to temporary total disability compensation at the rate of $482.88 per week beginning on 6 October 2006 through 31 March 2007 and from June 1, 2007 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
5. Defendants are entitled to a credit for any unemployment benefits received by plaintiff pursuant to the North Carolina Employment Security Act. N.C. Gen. Stat. § 97-42.1
6. Federal Trade Act benefits received by plaintiff are not State unemployment benefits or unemployment insurance, and there is no provision in the North Carolina Workers' Compensation Act allowing defendants any credit for Trade Act benefits received by plaintiff. Without an express statutory provision mandating a credit, the Workers' Compensation Act must be read strictly and no credit for Trade Act benefits can be provided. Evans v. AT T Tech., 103 N.C. App. 45,404 S.E.2d 183, rev'd on other grounds 332 N.C. 78, 418 S.E.2d 503 (1992).
7. Plaintiff is not entitled to attorney's fees or sanctions pursuant to N.C. Gen. Stat. § 97-88.1 for the unreasonable defense of this claim.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to the awards below defendants shall pay temporary total disability compensation to plaintiff at the rate of $482.88 per week beginning on 6 October 2006 through March 31, 2007 and from June 1, 2007 and continuing until further Order of the Commission. Any accrued compensation shall be paid in a lump sum. *Page 11 
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel.
3. Defendants are entitled to a credit to be subtracted from the lump sum payment to plaintiff equal to the amounts plaintiff received in unemployment benefits.
4. Defendants shall pay the costs.
This the 24th day of April 2009.
S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1